# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

DEBRA SUE WOYAN,                          )
                                          )
                Plaintiff,            )
                                          )
v.                                        )          CIVIL ACTION NO. 3:14-16422
                                          )
CAROLYN W. COLVIN,                        )
Acting Commissioner of Social Security,   )
                                          )
                Defendant.            )

### PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the decision of the Commissioner of Social Security denying Plaintiff's application for Disabled Widow's Benefits ("DWB") and Supplemental Security Income ("SSI"), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401- 433and 1381-1383f. By Standing Order entered May 16, 2014 (Document No. 3.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). This case presently is pending before the Court on the parties' cross-Motions for Judgment on the Pleadings. (Document Nos. 10 and 11.)

The Plaintiff, Debra Sue Woyan (hereinafter referred to as "Claimant"), filed an application for DWB and SSI on October 27, 2010 (protective filing date), alleging disability as of July 11, 2009, due to depression, nerves, irritable bowel syndrome ("IBS"), and trouble reading. (Tr. at 11, 129-34, 135-37, 144, 161.) The claims were denied initially and upon reconsideration. (Tr. at 56-59, 60-62, 65-67, 73-75, 76-78.) On August 30, 2011, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 82-83.) A hearing was held on August 29, 2012, before the Honorable Maria Hodges. (Tr. at 22-55.) By decision dated September 26, 2012, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 11-21.) The ALJ's decision became the final decision of the Commissioner on March 20, 2014, when the Appeals Council denied Claimant's request for review. (Tr. at 1-5.) On May 14, 2014,  Claimant brought

the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

To be entitled to DWB, a claimant must establish, among other things, that she is the widow of a fully insured wage earner, that she is unmarried, that she is at least 50 years old but not yet 60 years old, and that she is under a disability that began no later than 7 years after the wage earner's death or 7 years after she was last entitled to Survivor's Benefits. 42 U.S.C. § 402(e)(1); 20 C.F.R. § 404.335 (2012).

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2012). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2012). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger,

2

538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> (C) *Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
>
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.
>
> (4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal

3

limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[1] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant met all of the non-disability requirements for DWB. (Tr. at 13 at Finding No. 1.) The ALJ found that Claimant was the unmarried widow of the deceased insured worker and had attained the age of 50. (Id.) The ALJ noted that the prescribed period for

---

[1] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

DWB ended on June 30, 2009. (Tr. at 13, Finding No. 2.) Respecting SSI, the ALJ determined in this particular case that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since July 11, 2009, her alleged onset date. (Tr. at 13, Finding No. 3.) Under the second inquiry, the ALJ found that Claimant suffered from shoulder impingement, IBS, major depressive disorder, and generalized anxiety disorder, which were severe impairments. (Tr. at 14, Finding No. 4.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 14 Finding No. 5.) The ALJ then found that Claimant had a residual functional capacity for medium exertional work, as follows:

> [T]he claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c), except that the [C]laimant can frequently reach bilaterally in all directions. Further, the [C]laimanat would need work limited to simple to lower end of detailed instructions with no strict production quotas or time limits and only occasional interaction with the public.

(Tr. at 16, Finding No. 6.) At step four, the ALJ found that Claimant was unable to perform her past relevant work as a housekeeper/cleaner. (Tr. at 20, Finding No. 7.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ concluded that Claimant could perform jobs such as a kitchen worker and laundry worker, at the unskilled, medium level of exertion; as an assembler and a hand packer, at the unskilled, light level of exertion; and as an inspector and an order clerk, at the unskilled, sedentary level of exertion. (Tr. at 20-21, Finding No. 11.) On this basis, benefits were denied. (Tr. at 21, Finding No. 12.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the

evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is not supported by substantial evidence.

Claimant's Background

Claimant was born on April 2, 1958, and was 54 years old at the time of the administrative hearing, September 26, 2012. (Tr. at 20, 26, 28, 129, 135, 160.) Claimant had a tenth grade, or limited education and was able to communicate in English. (Tr. at 20, 26, 29, 162.) In the past, Claimant worked as a housekeeper/cleaner. (Tr. at 20, 153-59, 162.)

The Medical Record

The Court has reviewed all the evidence of record, including the medical evidence, and will discuss it below in relation to Claimant's arguments.

Physical Impairments:

Robert Holley, M.D.:

Claimant treated with Dr. Mark Nolan, M.D., from June 18, 1999, through August 4, 2005, primarily for problems concerning her IBS, abdominal pain, and depression, and other general health concerns. (Tr. at 240-72.)

On October 13, 2006, Dr. Holley performed a consultative examination at the request of the State agency disability determination service. (Tr. at 273-78.) Claimant reported that she experienced tachycardia with chronic and recurrent anxiety episodes. (Tr. at 274.) She also had palpitations with anxiety episodes only. (Id.) Her anxiety symptoms, which had a ten year history, included difficulty sleeping, increased appetite and fatigue, decreased interest in pleasure, increased worry and irritability, and decreased concentration. (Id.) She further reported chronic, recurrent, dull aches in her lumbosacral area that radiated to the right groin. (Id.) She rated the pain at a level five out of ten and indicated that she could sit and stand for one hour and walk for 30 minutes. (Id.) Musculoskeletal exam was unremarkable, with some lumbar tenderness but normal gait and station. (Tr. at 275.) Claimant had pain on range of motion of both shoulders.

6

(Id.) She was able to make a fist, oppose her fingers, and had normal strength, grip strength, and fine manipulation. (Tr. at 275-76.) Physical exam was unremarkable in other respects. (Id.) Dr. Holley assessed generalized anxiety disorder, IBS, mild right shoulder impingement syndrome to the cervical and lumbar spine, COPD, and hyperlipidemia. (Tr. at 276.)

On April 24, 2008, Claimant presented to the Emergency Room at Pleasant Valley Hospital with complaints of right lower quadrant abdominal pain. (Tr. at 284-90.) She reported a history of chronic diarrhea and IBS. (Tr. at 284.) On exam, Claimant had full range of motion of all major joints, normal gait, no edema bilaterally, and intact deep tendon reflexes. (Tr. at 287.) Her abdomen was soft, with tenderness to palpation in the right lower quadrant, with no masses or distention. (Id.) A CT Scan of Claimant's abdomen revealed minimal degree of diverticulosis of the sigmoid, but otherwise revealed no acute findings. (Tr. at 292.) Claimant returned to the Emergency Room on February 10, 2009, with continued complaints of low abdominal pain and back pain for one week. (Tr. at 308-09.) It was noted that Claimant had been diagnosed with kidney stones. (Tr. at 308.) It was noted that she had lower abdominal and flank tenderness to palpation but no rebound or guarding. (Id.) She was diagnosed with renal colic and given Toradol 60mg at the hospital. (Id.) She was discharged home with medications. (Tr. at 309.)

On November 23, 2010, Claimant was contacted by the State agency to determine why she had signed her Pain Questionnaire but left the responses blank. (Tr. at 378.) Claimant reported that she did not complete the form because she did not have any pain. (Id.)

On January 21, 2011, A. Rafael Gomez, M.D., a state agency medical consultant, completed a form Physical RFC Assessment, on which he opined that Claimant did not have a severe physical impairment. (Tr. at 352-59.) On March 30, 2011, Dr. Gomez again opined that her impairments were non-severe. (Tr. at 367-74.)

On March 27, 2011, Dr. Holley performed a consultative physical examination in connection with Claimant's current application for benefits. (Tr. at 360-66.) Claimant reported a chronic dull ache in the lumber area that radiated to the right knee and was very painful. (Tr. at 361.) Dr. Holley noted that Claimant was able to sit without difficulty, stand for 10 minutes, and walk for 20 minutes. (Id.) Her pain was aggravated by activity and range of motion and was decreased with medication and rest. (Id.) He noted no

7

recent change in her neurological condition. (Id.) On exam, Dr. Holley noted that Claimant had some tenderness over the L2-S1 area in the midline, had negative straight leg raising testing bilaterally with pain in both sitting and supine position, intact upper and lower extremity strength, and was able to stand and walk, get on and off the exam table with minimal difficulty, heel and toe walk, and squat without assistance. (Tr. at 362-63.) Ranges of motion were intact throughout. (Id.) He noted that Claimant's mood and affect were normal, she was oriented, and had normal short and long-term memory. (Tr. at 362.) Dr. Holly assessed major depressive disorder, bleeding disorder, panic disorder, left and right shoulder impingement, hearing loss on the right, COPD, lumbar radiculopathy, postmenopausal syndrom with vasomotor instability, hyperlipidemia, and IBS. (Tr. at 364.)

On April 27, 2011, Claimant presented to the Emergency Room at Pleasant Valley Hospital with complaints of abdominal pain. (Tr. at 384-404.) Diagnostic studies revealed a small stone in the left kidney and diverticulosis of the sigmoid colon without acute diverticulitis, but otherwise no acute findings. (Tr. at 393-404.)

Mental Impairments:

On October 10, 2002, Catherine Van Verth Sayre, M.A., psychologist, performed a consultative psychological evaluation at the request of the State Department of Health and Human Resources ("DHHR"). (Tr. at 226-27.) Claimant reported depression, difficulty coping after her son's death three years prior, and difficulty leaving the house and finishing anything she started. (Tr. at 226.) She reported feelings of hopelessness, lack of energy, crying spells, poor appetite, some illusions and hallucinations, poor memory, and problems with concentration and comprehension. (Id.) Claimant reported that was receiving therapy from Nancy Graham and Bregga Neal, but she did not find it helpful. (Tr. at 227.) Ms. Van Verth Sayre noted on mental status exam that Claimant gave indication of illusions but not hallucinations or delusions and that her immediate and recent memory was impaired. (Id.) She diagnosed major depression, recurrent, severe, and indicated that she would benefit from treatment. (Id.) She opined that until "she receives this treatment, she is unable to work and support herself." (Id.)

On July 7, 2003, Ms. Van Verth Sayre conducted another consultative evaluation for DHHR in connection with a prior application for benefits. (Tr. at 223-25.) Claimant reported depression, stress, worry,

8

feelings of guilt, and panic attacks. (Tr. at 223.) She indicated that she was taking Zoloft, which helped her depression. (Tr. at 223, 225.) Claimant reported that she visited her aunt and they went to town and doctor appointments together and that she liked to make candles and work in her flower beds, which she did daily. (Tr. at 224.) On mental status exam, Claimant was alert and cooperative, well-groomed, maintained normal eye contact, exhibited relevant and coherent speech, was oriented, had normal motor behavior and thought processes and content, but mildly depressed mood and mildly restricted affect. (Id.) Her judgment and immediate memory were within normal limits; insight was poor; concentration was moderately deficient; and recent memory was severely deficient. (Id.) She reported suicidal ideation two years ago and two suicidal attempts with pills. (Id.) Ms. Van Verth Sayre diagnosed bereavement; major depressive disorder, recurrent, moderate; and panic disorder with agoraphobia. (Id.) She opined that Claimant would benefit from grief therapy and that she "could work no more than 20 hours a month." (Tr. at 225.)

On June 23, 2004, Penny O. Perdue, M.A., a licensed psychologist, performed a consultative psychological examination in connection with a prior application for disability benefits. (Tr. at 220-22.) Ms. Perdue observed that Claimant drove herself to the evaluation, that she was cooperative and adequately groomed, and maintained normal posture and gait. (Tr. at 220.) Claimant reported daily depression, a lack of interest in things, poor appetite, difficulty sleeping, loss of energy, suicidal ideation with uncertain intent, and increased nervousness and worrying. (Id.) Claimant indicated that she was not taking her antidepressant medication consistently. (Id.) On mental status exam, Claimant was cooperative and interacted appropriately, had good eye contact, gave adequate verbal responses, exhibited relevant and coherent speech, had a depressed mood and restricted affect, and had normal thought content and processes. (Tr. at 221.) Insight was adequate and her judgment, immediate and recent memory, social functioning, and psychomotor activity were normal. (Id.) Remote memory was fairly well but concentration was markedly deficient and her persistence and pace were moderately slow and deficient. (Id.) Ms. Perdue noted Claimant's activities to have included mowing the yard, cleaning house, and going places with her aunt. (Id.) She reported that she was able to cook, clean, drive, and handle her own finances. (Id.) Ms. Perdue diagnosed major depressive disorder, single episode, moderate and opined that her prognosis was good. (Id.)

On October 27, 2006, Elizabeth Durham, M.A., a licensed psychologist, conducted a mental status

9

evaluation of Claimant at the request of the State agency disability determination service. (Tr. at 279-83.) Ms. Durham noted that Claimant drove herself, taking approximately one hour and that observed that her gait and posture were normal with no involuntary movements. (Tr. at 279.) Claimant reported a "very bad nerve condition," difficulties sleeping, poor appetite, crying episodes, and a dysphoric mood for two weeks. (Tr. at 279-80.) She indicated that she was not receiving any mental health treatment and that she saw Nancy Graham five years ago at Pleasant Valley Hospital. (Tr. at 280.) She currently was taking Lexapro, Klonopin, and Bentyl. (Id.) On mental status exam, Ms. Durham noted that Claimant had adequate hygiene and grooming, exhibited a good attitude and was cooperative, interacted appropriately during the evaluation, maintained normal eye contact, gave verbal responses of adequate length and depth, had spontaneous conversation, exhibited relevant and coherent speech, had a dysphoric mood and restricted affect, and had normal thought processes and content. (Tr. at 281.) Her insight was fair; concentration, persistence, and pace were mildly deficient; and her judgment, memory, psychomotor behavior, and social functioning were within normal limits. (Tr. at 281-82.) Ms. Durham diagnosed major depressive disorder, recurrent, moderate and generalized anxiety disorder. (Tr. at 281.) She noted Claimant's activities to have included visiting her mother and aunt and doing "things" at her house. (Tr. at 282.) Ms. Durham opined that Claimant's prognosis was poor but that she was able to manage her benefits. (Id.)

On April 24, 2008, Claimant presented to the Emergency Room at Pleasant Valley Hospital with complaints of right lower quadrant abdominal pain. (Tr. at 284-90.) Claimant reported increased depression, uncontrollable mood swings, insomnia, and visual hallucinations. (Tr. at 286.)

On May 21, 2008, William C. Steinhoff, Jr., M.A., a licensed psychologist, performed a consultative psychological evaluation at the request of DHHR. (Tr. at 296-301.) Claimant reported depression since her son died nine years prior, difficulty sleeping, feelings of tiredness and low energy, frequent crying spells, poor appetite with weight fluctuations, feelings of hopelessness, episodes of fainting and being out of breath with rapid heart rate particularly in crowds or around others, and feelings of things closing in around her. (Tr. at 296.) Mr. Steinhoff noted on mental status exam that Claimant was groomed and dressed adequately, maintained a slightly stooped posture and slow but steady gait, was cooperative but revealed underlying irritability, complained of problems concentrating, was quite hypertensive to the opinions and criticisms of

10

others, was tearful throughout the evaluation, and exhibited slow processing speed. (Tr. at 297-98.) Eye contact was limited, affect was restricted, speech was slow in rate and responses were brief, she was oriented to all spheres except for date, her mood was depressed with significant irritability, thought processes were slow but clear, and she appeared mildly guarded or suspicious. (Tr. at 298.) Remote memory was normal, insight was limited; judgment was mildly deficient; immediate memory, concentration and persistence were moderately deficient; and recent memory and pace were markedly deficient. (Id.) Results of the WAIS-III revealed a verbal IQ score of 73, a performance IQ score of 65, and a full scale IQ score of 67. (Id.) These results were suggestive of mild mental retardation but Mr. Steinhoff opined that the scores were at least a mild understatement of her intellectual abilities given her complaints of difficulty concentrating. (Tr. at 299.) Mr. Steinhoff diagnosed major depressive disorder, recurrent, severe with psychotic features and panic disorder without agoraphobia. (Tr. at 300.) In conclusion, Mr. Steinhoff opined that Claimant's ability to sustain concentration and persistence in completing tasks was markedly impaired. (Id.) He further opined that her ability to interact and relate predictably in social situations and in dealing with the public was markedly deficient. (Id.) He found her prognosis to be poor and recommended outpatient psychiatric assessment. (Id.)

On July 7, 2008, Ms. Durham completed another psychological evaluation. (Tr. at 302-07.) She noted that Claimant was driven to the evaluation by her aunt, had a good attitude and was cooperative, and maintained normal gait and posture. (Tr. at 302.) Claimant reported difficulties sleeping, poor appetite, crying spells, and a dysphoric mood. (Id.) On mental status exam, Claimant had adequate hygiene and grooming, exhibited a good attitude and was cooperative, interacted appropriately during the exam, was oriented, exhibited relevant and coherent speech, had a dysphoric mood and restricted affect, had normal thought processes and content, had fair insight and normal judgment, had normal memory and social functioning, and mildly deficient concentration, persistence, and pace, and mildly retarded psychomotor behavior. (Tr. at 304-05.) Results of the WAIS-III demonstrated a verbal IQ score of 83, a performance IQ score of 80, and a full scale IQ score of 80. (Tr. at 304.) Ms. Durham noted that claimant put forth good effort and was cooperative, and therefore, the results were considered valid. (Tr. at 305.) Results of the WRAT-3 indicated that Claimant performed reading and spelling at a third grade level and performed

11

arithmetic at a fourth grade level. (Id.) Ms. Durham diagnosed major depressive disorder, recurrent, moderate; generalized anxiety disorder, and a reading disorder. (Id.) She opined that claimant's prognosis was fair and that she was capable of managing her funds. (Tr. at 305-06.)

On January 4, 2011, Ms. Van Verth Sayre completed a further consultative psychological evaluation. (Tr. at 335-37.) Claimant indicated that she was applying for disability benefits because she did "not function." (Tr. at 335.) She reported a history of anxiety and depression since her son's death in 1999, with symptoms that included feeling scared, shaking, disoriented, and feeling that everyone was coming at her. (Id.) She reported going three days without bathing, an inability to finish any task, sleep and memory problems, and poor appetite. (Id.) On mental status exam, Claimant was appropriately groomed and cooperative, spoke clearly and concisely, was oriented, had a depressed mood and restricted affect, had normal stream of thought and content, had fair insight, had mildly impaired immediate memory, had moderately impaired remote memory and concentration, and had normal judgment, remote memory, persistence, pace, and social functioning. (Tr. at 336.) Claimant was diagnosed with major depressive disorder, recurrent, severe; panic disorder with agoraphobia; history of generalized anxiety disorder and reading disorder; and borderline intellectual functioning. (Tr. at 337.) Ms. Van Verth Sayre opined that Claimant's prognosis was fair. (Id.)

Bob Marinelli, Ed.D., a state agency consultant, completed a form Psychiatric Review Technique on January 18, 2011. (Tr. at 338-51.) Dr. Marinelli opined that Claimant's reading disorder, major depressive disorder, and generalized anxiety disorder were non-severe impairments that resulted in mild limitations of activities of daily living, social functioning, concentration, persistence, and pace and no episodes of decompensation of extended duration. (Id.) Dr. Marinelli opined that Claimant's allegations generally were consistent with exam findings with the exception of her reported limitations in concentration. (Tr. at 350.) On April 1, 2011, Dr. Marinelli opined that the evidence was insufficient to assess adequately during the relevant period from July 11, 1999, through May 1, 2009. (Tr. at 375-76.)

The record contains treatment records from Nancy Beth Lares, M.D., at Pleasant Valley Hospital from September 25, 2007, through January 25, 2012. (Tr. at 418-71.) On April 7, 2011, Dr. Lares noted that Claimant's judgment and memory were normal and that her affect was depressed. (Tr. at 421.) She changed

Claimant's medications. (Tr. at 422.) On April 27, 2011, Claimant reported anxiety, irritability, and sleep disturbances but denied any decreased ability to concentrate. (Tr. at 425.) Mental status was grossly normal and Dr. Lares assessed depression. (Tr. at 426.) On June 9, 2011, Claimant reported decreased concentration, but mental status was grossly normal. (Tr. at 430-32.) She was continued on her medications. (Tr. at 432.) On October 12 and 21, 2011, Claimant again reported anxiety and sleep disturbances, but denied decreased concentration, irritability, panic attacks, tearfulness, and suicidal or homicidal ideations. (Tr. at 435, 440.) Mental status was grossly normal. (Tr. at 436.) On November 21, 2011, Claimant reported depression and indicated that she had not had counseling. (Tr. at 439.)

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision is not supported by substantial evidence for several reasons. (Document No. 10 at 5-7.) Claimant alleges that the ALJ erred in assessing Claimant's RFC and finding that she was capable of performing medium exertional level work. (Document No. 10 at 5-7.) In this regard, Claimant asserts that the ALJ failed to explain why she gave little weight to Dr. Steinhoff's opinion and no weight to Ms. Van Verth Sayre's opinion. (Id. at 5.) She asserts that the ALJ attempted to justify the weight accorded these two medical sources by finding that Claimant was not credible. (Id. at 6.) However, Claimant alleges that the ALJ failed to provide a reasonable explanation for her credibility assessment. (Id.) Claimant further alleges that the ALJ erred in finding her capable of performing medium exertional level work because her physical and mental limitations prevent such work. (Id.) Claimant asserts that even if she was capable of performing sedentary exertional level work, she would have gridded out on her 50th birthday, April 2, 2008, which preceded the expiration of the prescribed period. (Id.) Finally, Claimant alleges that the ALJ erred in failing to incorporate all of Claimant's limitations in her hypothetical questions to the VE. (Id. at 6-7.)

In response, the Commissioner asserts that contrary to Claimant's allegation, the ALJ explained that she gave little weight to Mr. Steinhoff's opinion because he examined Claimant on only one occasion and the limitations he assessed were inconsistent with the record as a whole. (Document No. 11 at 9-12.) Because Mr. Steinhoff examined Claimant on only one occasion, the Commissioner asserts that his opinion was entitled deference as only an examining source. (Id. at 10.) The Commissioner notes that the ALJ found that

13

Mr. Steinhoff's marked to severe limitations in attention and concentration were inconsistent with Ms. Van Verth Sayre's findings of only moderate limitations and Claimant's denials of decreased concentration in 2011. (Id.) The Commissioner further asserts that Mr. Steinhoff's marked limitations in interaction and dealing with the public were inconsistent with Claimant's reports that she was able to spend time with others and talk on the phone. (Id. at 11.) Nevertheless, the ALJ accommodated any limitation in these regards by limiting Claimant to only occasional interaction with the public. (Id.) The ALJ accommodated Mr. Steinhoff's limitation of memory by limiting her to simple to lower end of detail instructions and also required no quotas or time limits. (Id.) The Commissioner therefore asserts that the ALJ adequately explained why she gave little weight to Mr. Steinhoff's opinion. (Id. at 12.)

Regarding Ms. Van Verth Sayre, the Commissioner asserts that contrary to Claimant's allegation, the ALJ gave no weight to her opinion only to the extent that she offered opinions regarding legal matters reserved to the Commissioner. (Id. at 12-13.) No weight was given to Ms. Van Verth Sayre's opinion that she was unable to return to work or work more than 20 hours per week because such opinions were legal opinions of disability. (Id. at 13.) The Commissioner points out that Ms. Van Verth Sayre found fewer limitations in her 2011 opinion than in her prior opinion. (Id.) The ALJ gave the remainder of her opinion some weight to the extent that it was supported by the evidence and accounted for her limitations in memory and concentrating. (Id.)

The Commissioner further asserts that the ALJ explained that she found Claimant's allegations not fully credible because they were inconsistent with the objective evidence and her reported activities. (Id. at 13-15.) The ALJ noted that physical examination findings essentially were normal and that her mental allegations were inconsistent with a January 2011 mental status examination and other examinations. (Id. at 14.) Furthermore, Claimant's subjective complaints were inconsistent with her daily activities. (Id. at 14-15.) Thus, the Commissioner asserts that the ALJ properly assessed Claimant's credibility and that the ALJ's findings and RFC assessment were supported by the substantial evidence of record. (Id. at 15.)

<u>Analysis</u>.

1. <u>RFC Assessment</u>.

Claimant first alleges that the ALJ erred in assessing her physical RFC because she failed to include

14

all of Claimant's limitations or explain the weight given to the opinions of Mr. Steinhoff and Ms. Van Verth Sayre or explain her credibility assessment. (Document No. 10 at 5-7.) "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Pursuant to SSR 96-8p, the RFC assessment "must be based on all of the relevant evidence in the case record," including "the effects of treatment" and the "limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication." Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a), 416.945(a) (2012). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

Opinions on a claimant's Residual Functional Capacity are issues that are reserved to the Commissioner. The Regulations state that:

> We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to subpart P of part 404 of this chapter, your residual functional capacity . . . or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

See 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2) (2012).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physicians' opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

The Regulations state that opinions on these issues are not medical opinions as described in the

Regulation dealing with opinion evidence (20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2)); rather, they are opinions on issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e) and 416.927(e). For that reason, the Regulations make clear that "[w]e will not give any special significance to the source of an opinion on issues reserved to the Commissioner. . . ." Id. §§ 404.1527(e)(3) and 416.927(e)(3). The Regulations further provide that "[f]or cases at the Administrative Law Judge hearing or Appeals Council level, the responsibility for deciding your residual functional capacity rests with the Administrative Law Judge or Appeals Council." See 20 C.F.R. §§ 404.1545 and 416.946 (2012). However, the adjudicator must still apply the applicable factors in 20 C.F.R. § 416.927(d) when evaluating the opinions of medical sources on issues reserved to the Commissioner. See Social Securing Ruling ("SSR") 96-5p, 61 FR 34471, 34473 (1996).

Social Security Ruling 96-5p makes a distinction between an RFC assessment, which is "the adjudicator's ultimate finding of 'what you can still do despite your limitations,'" and a "'medical source statement,' which is a 'statement about what you can still do despite your impairment(s)' made by an individual's medical source and based on that source's own medical findings." Id. SSR 96-5p states that "[a] medical source statement is evidence that is submitted to SSA by an individual's medical source reflecting the source's opinion based on his or her own knowledge, while an RFC assessment is the adjudicator's ultimate finding based on a consideration of this opinion and all the other evidence in the case record about what an individual can do despite his or her impairment(s)." Adjudicators "must weigh medical source statements under the rules set out in 20 C.F.R. § 416.927, providing appropriate explanations for accepting or rejecting such opinions." Id. at 34474.

As stated above, the ALJ found that Claimant was capable of performing medium exertional level work with limitations to simple to lower end detailed instructions, no strict production quotas or time limits, and only occasional interaction with the public. (Tr. at 16.) In determining these limitations, the ALJ gave the May 2008 opinion of Mr. Steinhoff little weight because he examined Claimant on only one occasion and his opinion was inconsistent with the evidence of record. (Tr. at 19.) The ALJ gave the October 2002, July 2003, and January 2011, opinions of Ms. Van Verth Sayre some weight to the extent that they were consistent with the ALJ's RFC assessment and no weight to the extent that they contained opinions as to disability. (Id.) The ALJ also gave the opinions of Ms. Perdue and Ms. Durham some weight. (Tr. at 18.)

16

The ALJ noted that Ms. Durham examined Claimant on only two occasions, and therefore assigned the opinions some weight to the extent that they allowed Claimant to perform significant work activity. (Id.)

The undersigned notes that the mental evidence of record in this matter is scant and is comprised primarily of consultative evaluation reports. The ALJ devoted only four paragraphs in her opinion to the assessment of Claimant's mental impairments in the credibility section of the decision, which was devoted to weighing the opinions of the aforementioned four examiners. (Tr. at 18-19.) The undersigned finds striking that the ALJ specifically discounted Mr. Steinhoff's opinion, in part, because he examined Claimant only once, but gave the opinion of Ms. Perdue some weight, when she examined Claimant on only one occasion. Such disparity is compounded by the fact that Mr. Steinhoff opined marked limitations in Claimant's ability to sustain concentration and persistence and Ms. Perdue similarly assessed marked limitations in concentration and remote memory. Ms. Perdue however, assessed only moderate limitations in persistence and pace. The undersigned notes that Mr. Steinhoff's opinion contained some internal inconsistencies regarding examination findings and conclusions, which were not noted by the ALJ. The undersigned further notes that Ms. Durham examined Claimant on only two occasions and Ms. Van Verth Sayre examined her on three occasions. The undersigned finds however, that the ALJ failed to provide any explanation as to how Mr. Steinhoff's opinion was inconsistent with the evidence of record, particularly in light of Ms. Perdue's opinion, and why the opinions from the other three examiners were entitled to some weight. (Tr. at 18-19.) The ALJ provided some correlation of Ms. Van Verth Sayre's January 2011, opinion which indicated normal social functioning, persistence, and pace and moderate deficiencies in concentration, to the treatment notes of the same time frame from Dr. Lares who indicated that Claimant's depression was stable. (Tr. at 18.) Thus, the evidence establishes that sometime after Ms. Durham's and Mr. Steinhoff's opinions rendered in 2008, that Claimant's mental conditions improved, as of 2011. Thus, the weight accorded Ms. Van Verth Sayre's January 2011, opinion is supported by the other substantial evidence of record at that time. Nevertheless, the undersigned finds that the ALJ failed to explain how Mr. Steinhoff's opinion was inconsistent from the other substantial evidence of record entirely. For this reason, the undersigned recommends that the matter be remanded for further consideration and explanation of the opinion evidence of record.

17

2. Credibility Assessment.

Claimant also alleges that the ALJ erred in assessing her credibility in that the ALJ failed to provide a reasonable explanation as to why she was not credible. (Document No. 10 at 6.)  A two-step process is used to determine whether a claimant is disabled by pain or other symptoms. First, objective medical evidence must show the existence of a medical impairment that reasonably could be expected to produce the pain or symptoms alleged.  20 C.F.R. §§ 404.1529(b) and 416.929(b) (2012); SSR 96-7p; See also, Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996).  If such an impairment is established, then the intensity and persistence of the pain or symptoms and the extent to which they affect a claimant's ability to work must be evaluated.  Id. at 595.  When a claimant proves the existence of a medical condition that could cause the alleged pain or symptoms, "the claimant's subjective complaints [of pain] must be considered by the Secretary, and these complaints may not be rejected merely because the severity of pain cannot be proved by objective medical evidence." Mickles v. Shalala, 29 F.3d 918, 919 (4th Cir. 1994). Objective medical evidence of pain should be gathered and considered, but the absence of such evidence is not determinative.  Hyatt v. Sullivan, 899 F.2d 329, 337 (4th Cir. 1990). A claimant's symptoms, including pain, are considered to diminish her capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4) (2012).  Additionally, the Regulations provide that:

> [w]e will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating, examining, or consulting physician or psychologist, and observations by our employees and other persons.  . . .  Factors relevant to your symptoms, such as pain, which we will consider include:
>
> (i) Your daily activities;
>
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms.
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;

18

(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;

(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 or 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) (2012).

SSR 96-7p repeats the two-step regulatory provisions:

First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms. * * * If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7p, 1996 WL 374186 (July 2, 1996). SSR 96-7p specifically requires consideration of the "type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms" in assessing the credibility of an individual's statements. Significantly, SSR 96-7p requires the adjudicator to engage in the credibility assessment as early as step two in the sequential analysis; i.e., the ALJ must consider the impact of the symptoms on a claimant's ability to function along with the objective medical and other evidence in determining

19

whether the claimant's impairment is "severe" within the meaning of the Regulations. A "severe" impairment is one which significantly limits the physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(c) and 416.920(c).

Craig and SSR 96-7p provide that although an ALJ may look for objective medical evidence of an underlying impairment capable of causing the type of pain alleged, the ALJ is not to reject a claimant's allegations solely because there is no objective medical evidence of the pain itself. Craig, 76 F.3d at 585, 594; SSR 96-7p ("the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record"). For example, the allegations of a person who has a condition capable of causing pain may not be rejected simply because there is no evidence of "reduced joint motion, muscle spasms, deteriorating tissues [or] redness" to corroborate the extent of the pain. Id. at 595. Nevertheless, Craig does not prevent an ALJ from considering the lack of objective evidence of the pain or the lack of other corroborating evidence as factors in his decision. The only analysis which Craig prohibits is one in which the ALJ rejects allegations of pain solely because the pain itself is not supported by objective medical evidence.

The ALJ noted the requirements of the applicable law and Regulations with regard to assessing pain, symptoms, and credibility. (Tr. at 17-19.) The ALJ found at the first step of the analysis that Claimant's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (Tr. at 19.) Thus, the ALJ made an adequate threshold finding and proceeded to consider the intensity and persistence of Claimant's alleged symptoms and the extent to which they affected Claimant's ability to work. (Tr. at 17-19.) At the second step of the analysis, the ALJ concluded that Claimant's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. at 19.)

Claimant takes issue with the ALJ's credibility assessment as it relates to her mental impairments. The ALJ began his assessment by acknowledging Claimant's testimony that she

20

experienced depression, anxiety, difficulties sleeping, problems dealing with stress, panic attacks, tiredness, and feelings of people coming towards her. (Tr. at 17.) Claimant reported that she attempted to go to a counselor and took medications to treat her conditions. (Id.) Claimant further testified that she had limitations in concentrations and understanding, remembering, and completing tasks. (Id.) Nevertheless, the ALJ noted that she was able to care for her personal needs, prepare meals, complete some cleaning, spend time with others, talk on the phone, occasionally drive, manage her finances, watch television, and read. (Id.) The ALJ acknowledged Ms. Van Verth Sayre's January 2011 opinion and Dr. Lares' notations of improvement in her mental conditions. (Tr. at 18.) As discussed above, the ALJ considered the opinion evidence of record. (Tr. at 18-19.) Thus, in view of the foregoing, the undersigned finds that with the exception of the opinion evidence, the ALJ's consideration of the factors set forth in the Regulations, in assessing Claimant's credibility is supported by the evidence. Without a sufficient analysis of the opinion evidence however, the credibility assessment is incomplete. Thus, remand is required for further consideration of Claimant's credibility.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **GRANT** the Plaintiff's Motion for Judgment on the Pleadings (Document No. 10.), **DENY** the Defendant's Motion for Judgment on the Pleadings (Document No. 11.), **REVERSE** the final decision of the Commissioner, **REMAND** this matter pursuant to sentence four of 42 U.S.C. 405(g) for further administrative proceedings to re-evaluate the opinion evidence of record relating to Claimant's mental impairments and to re-evaluate Claimant's credibility, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, Chief United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have three days (mailing/service) and then fourteen days (filing of objections) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of

the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, Chief Judge Chambers, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy of the same to counsel of record.

Date: August 31, 2015.

R. Clarke VanDervort
United States Magistrate Judge

22